UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

KENNETH LESLEY                                    CIVIL ACTION

VERSUS                                            NUMBER: 10-0701

N. BURL CAIN                                      SECTION: "B"(5)

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(A), presently before the Court is the 28 U.S.C. §2254 application for federal habeas corpus relief of petitioner, Kenneth Lesley, the State's response, and Lesley's traverse. (Rec. docs. 3, 12, 13). Having determined that an evidentiary hearing is not necessary, it is recommended, for the reasons that follow, that the instant petition be dismissed with prejudice.

## PROCEDURAL HISTORY

Petitioner Lesley is a state prisoner who is presently incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  Lesley was charged by grand jury indictment with second degree murder in violation of LSA-R.S. 14:30.1.  Lesley pled not guilty and ultimately waived his right to a jury trial.  After a

bench trial before Judge Reginald Badeaux of the Twenty-Second Judicial District Court for the Parish of St. Tammany, Lesley was found guilty as charged and was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.

On September 17, 2004, the Louisiana First Circuit Court of Appeal affirmed Lesley's conviction and sentence. State v. Lesley, 885 So.2d 52 (Table), No. 2003-KA-2498 (La. App. 1 Cir. 2004) (unpublished opinion).[1]  On March 24, 2005, the Louisiana Supreme Court denied Lesley's writ application. State v. Lesley, 896 So.2d 1035, No. 2004-K-3010 (La. 2005).  On October 3, 2005, the United States Supreme Court denied Lesley's application for writ of certiorari. Lesley v. Louisiana, 546 U.S. 878 (2005).

On March 21, 2006, a "Uniform Application for Post-Conviction Relief", signed by counsel, Stephen A. Yazbeck, Esq., was filed with the state district court, along with a 57-page "Memorandum of Law in Support of Post-Conviction Relief", signed and written by Lesley.[2]  As a result of the hybrid nature of Lesley's post-conviction application, with the application itself being signed by

---

[1]A copy of the Louisiana First Circuit's unpublished opinion is contained in the State record, vol. 4 of 4.

[2]Copies of the above-referenced pleadings are contained in the State record, vol. 4 of 4.

counsel and the supporting memorandum being written by Lesley, the district court requested that counsel redraft the application "to clarify the arguments".[3]  Lesley represents that on July 11, 2006, he received a letter from Stephen Yazbeck advising him of the district court's request.  (Rec. doc. 3, p. 2; rec. doc. 13, p. 2).[4]

On July 27, 2006, Lesley filed with the district court a <u>pro se</u> motion for production of documents, requesting the materials contained in the "District Attorney's Files".[5]  On August 8, 2006, the district court granted Lesley's motion, ordering that the district attorney provide the requested documents at the cost of $.35 per page.[6]

On December 14, 2006, Lesley filed with the district court a <u>pro se</u> writ of mandamus, seeking to have the district court compel

---

[3]While there is no evidence in the State record of the district court's request that counsel redraft the post-conviction application, the district court acknowledges that it made such a request in footnote one of its August 22, 2008 Order denying Lesley post-conviction relief.  A copy of the district court's Order is contained in the State record, vol. 4 of 4.

[4]Lesley has not provided the Court with a copy of the July 11, 2006 letter he received from Yazbeck.

[5]A copy of Lesley's motion for production of documents is contained in the State rec., vol. 4 of 4.

[6]A copy of the district court's August 8, 2006 Order is contained in the State rec., vol. 4 of 4.

the district attorney to provide him with a cost estimate for the production of the requested materials.[7]  On January 10, 2007, the district court denied Lesley's writ of mandamus as premature.[8]

On June 6, 2007, counsel, Stephen Yazbeck, submitted on Lesley's behalf another "Uniform Application for Post-Conviction Relief", along with a 21-page supporting memorandum.[9]  On August 22, 2008, the district court, declaring that the matter was before it pursuant to the "Application for Post Conviction Relief dated June 6, 2007", denied Lesley post-conviction relief.[10]  On April 3, 2009, the Louisiana First Circuit Court of Appeal likewise denied Lesley post-conviction relief.  State v. Lesley, No. 2008-KW-2492 (La. App. 1 Cir. 2009) (unpublished opinion).[11]  Finally, on February 5, 2010, the Louisiana Supreme Court again denied a writ application from Lesley, this time refusing to review the denial of

---

[7]A copy of Lesley's writ of mandamus is contained in the State record, vol. 4 of 4.

[8]A copy of the district court's January 10, 2007 handwritten Order is contained in the State record, vol. 4 of 4.

[9]A copy of the second post-conviction application, along with the supporting memorandum written by counsel, is contained in the State record, vol. 4 of 4.

[10]A copy of the district court's August 22, 2008 Order is contained in the State record, vol. 4 of 4.

[11]A copy of the Louisiana First Circuit's unpublished opinion is contained in the State record, vol. 4 of 4.

post-conviction relief.  <u>State ex rel. Lesley v. State</u>, 27 So.3d 294, No. 2009-KH-0916 (La. 2010).

On February 23, 2010, Lesley filed the instant habeas corpus application.  In his habeas application, Lesley raises the following claims: (1) that the State submitted insufficient evidence to support his conviction; (2) that the trial court erred in allowing an expert to testify outside the field of his expertise; (3) that the trial court erred in ruling on a sequestration violation by the victim's sister; and, (4) that he received ineffective assistance of counsel.  The State, in its response, admits that petitioner has properly exhausted his state court remedies as required under <u>Rose v. Lundy</u>, 455 U.S. 509 (1982).  (Rec. doc. 12, p. 6).  The State, however, asserts that the instant action is untimely.  (Rec. doc. 12, pp. 2-5).

**<u>TIMELINESS</u>**

Under 28 U.S.C. §2244(d)(1), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L.No. 104-132, 110 Stat. 1214 (1996)(effective April 24, 1996), state prisoners like Lesley have one year from the date that their convictions become final to timely seek federal habeas corpus relief.  Section 2244(d)(2) further provides that the time during which a properly filed application for post-conviction relief or other collateral review with respect to the pertinent judgment is

pending is not counted against the one-year limitation period. Although the State has done so in this case, the one-year time bar may be raised by the Court <u>sua</u> <u>sponte</u>. <u>Kiser v. Johnson</u>, 163 F.3d 326, 328-29 (5th Cir. 1999).

Lesley's conviction and sentence became final on October 3, 2005. Under §2244(d), Lesley thus had until October 3, 2006, within which to timely seek federal relief unless the one-year time period was tolled by the pendency of a properly-filed application for post-conviction relief or other collateral review.

On March 21, 2006, an atypical post-conviction application was filed with the state district court on Lesley's behalf, atypical in that the application was signed by counsel, but the lengthy supporting memorandum was written by Lesley. As noted earlier, due to the hybrid nature of the application, the district court requested that counsel redraft the application "to clarify the arguments." Pursuant to the court's request, counsel submitted another post-conviction application and supporting memorandum to the district court on June 6, 2007, and it was this later filed application which the district court ultimately considered and rejected.

The State argues that because the state district court did not consider the first post-conviction application, filed March 21, 2006, it should not be considered to have been properly filed for

purposes of interrupting prescription under §2244(d)(2).  The State further submits that Lesley's July 27, 2006 motion for production of documents did not toll prescription under the provisions of §2244(d)(2) because said pleading did not challenge Lesley's judgment of conviction, but rather, merely requested documents. The State submits that because the above-referenced pleadings were the only ones filed during Lesley's one-year prescriptive period and neither interrupted prescription, Lesley's statute of limitations expired on or about October 5, 2006.

It is clear that Lesley's July 27, 2006 motion for production of documents did not interrupt the running of prescription.  See Boyd v. Ward, 2001 WL 533221, *4 (E.D. La. 2001) ("Although Boyd had, in the interim, litigated his entitlement to a free copy of his guilty plea and sentencing transcript through the state court system, the Court does not believe that those proceedings qualify as '. . . application[s] for State post-conviction or other collateral review . . .' so as to toll the limitation period under §2244(d)(2) because they were preliminary in nature and did not directly call into question the validity of Boyd's conviction or sentences.")  See also Brisbon v. Cain, 2000 WL 45872, *2 (E.D. La. 2000).  It is not, however, clear that Lesley's March 21, 2006 post-conviction application did not toll prescription.

The fact that the district court requested that counsel

redraft the application "to clarify the arguments" does not mean that the original, March 21, 2006 application ran afoul of any state procedural rule and, as such, should not be considered to have been properly filed. The State cites no case law to support its argument that Lesley's March 21, 2006 post-conviction application did not toll prescription and this Court has not found any case law applicable to the unique facts of the instant situation.

Assuming that Lesley's March 21, 2006 post-conviction application did, in fact, interrupt prescription, there is no question that the instant habeas action was timely filed. Accordingly, this Court will proceed to address the merits of Lesley's claims following its recitation of the applicable facts and standard of review.

**FACTS**[12]

On January 6, 2002, Tina Lesley was found dead, curled up and lying on her left side on the sofa of the trailer home she shared with petitioner, her husband. She was lying in almost a fetal position, with her head propped up on the arm of the sofa, as

---

[12] The facts as set forth hereinafter are as found by the State appellate tribunal on Lesley's direct appeal. Lesley has not contested the accuracy of these facts as related. As noted earlier a copy of the unpublished opinion rendered by the Louisiana First Circuit Court of Appeal is contained in the State record, vol. 4 of 4.

though she were watching the television across the room.  She had been shot once through the right side of the head.  At trial, petitioner admitted shooting his wife.  However, he claimed that the shooting was accidental and occurred during the course of a struggle over a black-powder rifle.

Authorities were alerted to the shooting by petitioner's mother, who lived next door.  She heard the shot and called 911, reporting her belief that her son had shot his wife.  Then petitioner ran to his mother's home and also spoke to the 911 operator.  He admitted that he shot his wife.  Petitioner was crying and emotional, but he did not characterize the shooting as accidental and indicated at one point, "I am going to be in jail for a long time."

The State called St. Tammany Parish Deputy Coroner, Dr. Michael DiFatta, to testify about the manner in which the victim was killed.  Dr. DiFatta was accepted as an expert in forensic pathology, which includes education in forensic ballistics and injury patterns to the body.  He indicated that his examination of the body and the circumstances of the crime convinced him that the killing was a homicide and was not accidental.  Specifically, he explained that a bullet entered the skull of the victim through the inside of the right ear and traveled inside the skull, fragmenting into many pieces inside the victim's head.  No gunpowder residue or

9

gases were found impregnated in the victim's skin in the area of the bullet's entry, indicating that the fatal wound was not fired at close range.  The expert also found fresh bruises on her shoulders, which would have been consistent with an injury shortly before her death.

Dr. DiFatta testified that there was no question in his mind that the victim was lying on the sofa when she was shot.  First, she was found in a relaxed, recumbent position, not a position someone would fall into by chance upon being shot.  Second, the brain, blood, and bone fragments were confined to the arm of the sofa upon which her head was resting and the area under her head and body.  Had she been shot and then fallen over, blood and brain matter would have been found further up on the sofa and on the wall.  Finally, the blood flow from the wounds was pulled downward by gravity, in a pattern indicating that Tina was reclining when shot.  The blood flow patterns were consistent with the victim having been shot as she lay on the sofa.  Moreover, he did not find it likely that the bruises on the victim's body would have come from the stock of the rifle being held by the victim during a struggle over the weapon.  Furthermore, Tina's hands were in a relaxed position and showed no sign of defensive action.  Because of the shattering of the bullet inside the skull and the lack of any exit wound, Dr. DiFatta was not able to indicate the angle from

10

which the deadly shot was fired.

Sergeant Carl L. Fullilove, Jr., accepted without objection as a firearms expert, arrived on the scene to investigate at about 4:05 A.M.  Upon entering the trailer, he found a black-powder rifle lying on the floor just inside the door.  The victim was lying on the couch to the left and had not yet been moved by emergency personnel.  Based on his testing of the black-powdered rifle, it was clear that this was the murder weapon and that it was fired from a range of three to five feet from the victim.  Sergeant Fullilove explained that the loaded condition of this type of weapon is visible to the eye.  There are two ways to make the gun safe.  Unless these safety mechanisms are disengaged, the weapon will not fire.

Sergeant James Franklin interviewed petitioner at the police station the night of the incident.  He had been crying.  Petitioner was read his Miranda rights and indicated that he understood them. A videotaped statement was taken, a transcript of which was introduced into evidence.  During the statement, petitioner gave varying details about who retrieved the murder weapon from its usual place in the bedroom of the trailer.  However, he was consistent in saying that he fired at his wife and shot her. Petitioner's story was that his wife had been having an affair with another man and that she was depressed and suicidal.

11

Detective Scott Knight, who investigated the scene before the victim was moved, confirmed that there was no blood spatter on the wall or back of the sofa and no stippling on the victim.  She was lying on her left side with her knees bent.  She was clad in a shirt, underwear and socks.

Joyce Poole, the victim's mother, described the relationship between her daughter and the petitioner as a troubled one.  She claimed that petitioner was verbally abusive.  She was aware that her daughter had been depressed and was taking an antidepressant medication a few months before the homicide.  She had been professionally evaluated for depression.  She also knew that her daughter was romantically involved with another man.  Tina had confessed the affair to petitioner in November, 2002, against her mother's advice.  When she last saw Tina on January 4, 2002, she asked her if she was suicidal, as petitioner had been reporting that to the family.  Tina denied it and assured her mother that she would not do that.  Tina and petitioner had two young children who lived in the home.  Tina's mother was there when Tina had a conversation with Dwight Gatewood, her boyfriend.  She warned her daughter that the phones might be bugged.  Later that day, when they saw petitioner, he repeated a phrase used between Tina and Dwight on the phone, confirming that he had eavesdropping equipment in the home.  Tina's mother reported that Tina was planning on

leaving the petitioner.   She was looking for an apartment and planned to file for legal separation and a restraining order the following Monday.

Petitioner's stepbrother, Stephen Hendrix, is married to Tina's sister.   The day before the murder, petitioner called him and told him that he was stressed out over his wife and home.   He reported that they had been fighting and she tried to shoot herself and they struggled over the gun.   Petitioner remarked that the next time "she might accidentally shoot herself."   He asked Steve if Steve would come over if he and Tina were struggling over a gun, because it might scare her.   Petitioner also asked that Steve keep their conversation a secret.   In addition, he asked if Steve's wife was suicidal.   Steve found the conversation strange and reported it to police right after the shooting.

Petitioner called several witnesses.   Lawrence Haik, a friend, testified that in the year before the killing, petitioner had reported marital problems.   He spoke to the petitioner at the police station the morning after the shooting and believed the petitioner was drunk.   Petitioner told him that they had gone out drinking and that he and Tina started to argue after returning home.   Petitioner told him that he had not loaded the gun but that he had taken the ramrod out before the shooting.   Petitioner indicated he was trying to place the barrel in his mouth, but it

13

would not fit.  He told Lawrence he was shocked the gun went off.
He further told him that Tina was leaning away from him on the sofa
when he fired.  Lawrence confirmed that petitioner knew about his
wife's affairs and the details of sexual conduct with other men
long before the day of the shooting.

Kenneth Lesley testified in his own defense.  He claimed that
on the evening of the shooting, the two had gone out drinking and
dancing.  When they left, they drove to the site of their new home
under construction and started to have sex.  Then petitioner made
a remark about Dwight Gatewood, and Tina refused to have further
contact with him.  They drove home, and she went inside the
trailer.  He remained outside for about two minutes.  According to
petitioner, when he entered the trailer, his wife was sitting on
the floor with the gun.  They argued over her apparent threats to
commit suicide.  He threatened to call the police.  At that point,
she got up with the gun in her hand and grabbed the phone.  He then
grabbed the gun and hit her shoulder twice with the palm of his
hand.  Then he put the gun in his own mouth.  However, it would not
fit, and he pulled the ramrod out.  He then staged the same pose
with the gun in his mouth.  Tina tried to get him to take the gun
out of his mouth and she told him that she might have called 911.
Petitioner took the phone and hung it up.  Tina grabbed the gun and
pulled it and him toward the couch.  She jumped on the couch and

14

demanded that he give her the gun.  He pulled away, and she suddenly let go of the gun barrel.  Petitioner stumbled backward, and the gun went off.  He claimed that Tina was sitting on her feet on the sofa and went down simultaneously as she was shot.

Petitioner described Tina's visit for a psychiatric assessment in December 2001 for suicidal/homicidal ideation.  He claimed that several days before the shooting, he had seen her in their bed with a pistol in her mouth.  He described her as physically abusive to him.

On cross-examination, petitioner testified that he had purchased the black-powder rifle for Tina and shown her how to use it.  They had many weapons in the home.  He admitted that the black-powder rifle involved in the shooting was a double-action firearm.  In order to fire it, you have [to] pull back and expose the percussion cap, which is then visible.  In addition, the two safety mechanisms must be disengaged.  Petitioner claimed that he did not know the gun was loaded and that the safeties must have gotten knocked off in the struggle.  He said he did not notice that the mechanical safety was disengaged so that the gun was ready to discharge.  He also claimed that the gun was already cocked.

Petitioner admitted Tina may have told him at the house that she preferred to be with someone else.  But he denied shooting her in anger.  According to petitioner, he was trying to build a home

15

for the family and to rescue the relationship with his wife.  When he walked in, she was already inside on the floor with the gun and had taken her pants and shoes off.  At trial, petitioner indicated that the victim turned her head before he fired.  He denied that she was curled up on the sofa.  When confronted with discrepant versions of the events given in earlier statements, he indicated that he was intoxicated and confused that evening.  Petitioner testified that after he shot his wife, he did not put the ramrod back in the gun, yet the police found it that way in the home. Finally, petitioner admitted being emotionally upset that night and that he had asked friends to help him find someone to help solve the problem of Tina's affair.

Various other witnesses testified about the couple's relationship.  Craig Lee, a friend of petitioner, testified about Tina's moods and about incidents where she struck her husband. Petitioner's father testified to hearing conversations about Tina's depression and described an incident where petitioner reported getting scratched because Tina got violent.  Beverly Lott, petitioner's stepfather's sister, saw a bite mark on petitioner's back in December 2001.

Alvin Lott, a co-worker, testified that petitioner asked him for the name of someone who could "rough up" Dwight Gatewood.  Mr. Lott also testified that petitioner had confided in him that Tina

16

did not clean the house or care for the children.

**STANDARD OF REVIEW**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. §2254.   Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact.   Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under §2254(d)(1) and questions of fact are reviewed under §2254(d)(2).   <u>Hill v. Johnson</u>, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."   28 U.S.C. §2254(d)(1).   The United States Supreme Court has noted:

> §2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning.   A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.   The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal

17

> principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams[ v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. §2254(d)(2); see also Hill, 210 F.3d at 485; 28 U.S.C. §2254(e)(1).

**MERITS**

### Insufficiency of Evidence

Lesley contends that there was insufficient evidence to establish specific intent in this case.  Specifically, Lesley argues that his alcohol intoxication so impaired him that he could not form the necessary specific intent to kill or inflict great bodily harm.

A petitioner has a federal due process right to be convicted only upon evidence that is sufficient to prove beyond a reasonable doubt the existence of every element of the offense.  Jackson v. Virginia, 443 U.S. 307, 316 (1979).  When a petitioner seeking

18

federal habeas relief contends that the evidence was insufficient to support a state court conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Gibson v. Collins, 947 F.2d 780, 781 (5th Cir.1991), quoting Jackson, 443 U.S. at 319.   The court applies this standard with explicit reference to the substantive elements of the criminal offense as defined by state law, Jackson, 443 U.S. at 323 n. 16, and the court "gives great weight to the state court's determination." Gibson, 947 F.2d at 782, 786; Porretto v. Stalder, 834 F.2d 461, 467 (5th Cir.1987) (Louisiana Supreme Court's review of evidence for sufficiency to prove guilt "entitled to great weight in a federal habeas review").   Either direct or circumstantial evidence can contribute to the sufficiency of the evidence underlying the conviction.   Schrader v.. Whitley, 904 F.2d 282, 287 (5th Cir.1990), citing Jackson, 443 U.S. at 319, 324-25; Pate v. Wainwright, 607 F.2d 669, 670 (5th Cir.1979) (per curiam).

Lesley was convicted of second degree murder, which is defined as "the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm." La.R.S. 14:30.1(A)(1).   "Specific criminal intent is that state of mind

which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). Specific criminal intent may be inferred from the circumstances present in the case and the actions of the defendant. State v. Jack, 596 So.2d 323, 326 (La. App. 3rd Cir.), writ denied, 600 So.2d 611 (La. 1992). In establishing that element, the state may rely on the legal presumption that a defendant "intended the natural and probable consequences of his act." La.R.S. 15:432.

A petitioner's intoxication at the time of a commission of a crime is immaterial except "[w]here the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent or of special knowledge required in a particular crime." La. Rev. Stat. 14:15(2). Under such circumstances, the fact of intoxication constitutes a defense to a prosecution for that crime. The intoxicated condition is in the nature of an affirmative defense such that the petitioner has the burden of proving the existence of the condition at the time of the offense. State v. Lemming, 612 So. 308 (La. App. 5th Cir. 1992).

In support of his claim that he was intoxicated at the time of the murder and, therefore, did not have the requisite specific intent, Lesley relies on the testimony of Patrick Kent who, without

20

objection from the prosecution, was qualified as "an expert in the field of substance abuse." (State rec., vol. 3 of 4, p. 525). Mr. Kent, based upon his interview with Lesley during which Lesley advised him how much alcohol he had consumed on the night of the murder, opined that at the time of the murder Lesley's blood alcohol was 0.15, approximately one and a half times the legal limit for driving. (State rec., vol. 3 of 4, pp. 527, 535). Based upon this estimation, it was Kent's opinion that Lesley, at the time of the murder, was under the influence of alcohol, but admitted that the amount of alcohol in Lesley's system would not have prevented him from firing a gun. (State rec., vol. 3 of 4, pp. 530, 536).

In addition to Kent's expert testimony, Lesley, in support of his claim that there was insufficient evidence to support a finding that he had the specific intent to kill or inflict great bodily harm, relies upon the lay testimony of three individuals, Angelic Bertacci, Larry Haik, and Delores Hendrix.  Angelic Bertacci, Lesley's sister who visited him in jail following his arrest, testified that her brother had "the smell of alcohol on his breath". (State rec., vol. 3 of 4, p. 544).  Larry Haik, Lesley's friend who came into contact with Lesley after police had arrived on the scene, described Lesley as being "drunk". (State rec., vol. 2 of 4, pp. 427-428).  Delores Hendrix, Lesley's mother who came

into contact with Lesley shortly after the murder, testified that her son "smelled like alcohol". (State rec., vol. 1 of 4, p. 176).

The fact that lay witnesses smelled alcohol on Lesley's breath or that, in their opinion, Lesley appeared to be drunk, is insufficient to overcome the trial court's finding that Lesley was guilty of second degree murder and, therefore, had the specific intent to kill or inflict great bodily harm. Ample evidence was submitted which reflected that Lesley and the victim did not have a good relationship. As reflected in the Louisiana First Circuit's factual recitation, Joyce Poole, the victim's mother, testified that Lesley was aware that the victim was engaged in a love affair with another man, specifically, Dwight Gatewood. According to Poole, the victim was planning, before her murder, to file for a legal separation. Numerous other witnesses, including Larry Haik, likewise testified that Lesley and the victim had a troubled relationship. Such a motive, coupled with the fact that even Lesley's expert, Patrick Kent, testified that Lesley was capable, at the time of the murder, of shooting a gun, provides ample evidence to support a guilty verdict on the charge of second degree murder. Accordingly, the Court finds that the district court's determination, on post-conviction, that Lesley "had the requisite intent", does not represent an unreasonable application of <u>Jackson</u>, to the facts of this case.

22

**Trial Court Erred in Allowing Expert to Testify Outside Field of Expertise**

Lesley argues that the trial court erred in allowing Dr. Michael DiFatta, qualified as an expert in forensic pathology, to testify with regard to the position the victim was in when she was shot. According to Lesley, such testimony was within the realm of ballistics, rather than forensic pathology and, therefore, outside Dr. DiFatta's expertise.

Lesley raised this same claim in connection with his direct appeal and his state post-conviction application. In connection with his direct appeal, the Louisiana First Circuit determined that Lesley was barred from raising a challenge to Dr. DiFatta's expertise due to his failure to raise a contemporaneous objection at trial. The state appellate court provided:

> In resumed questioning about the field of forensic ballistics, defense counsel again tried to ask very specific questions, and the trial judge asked whether he had any inquiry that would seriously detract from the witness's "experience or education, training or expertise." Defendant's counsel conceded that he could not seriously detract from Dr. DiFatta's qualifications and indicated that he would reserve technical questions for cross-examination. He did not register any contemporaneous objection to the handling of voir dire on the witness's qualifications. Although defendant suggests on appeal that the trial judge abdicated his role as gatekeeper under <u>State v. Foret</u>, 628 So.2d 1116 (La. 1993), he made no such claim in the trial court. Defendant did not even object when the witness testified to his opinion that the victim was reclining when shot or

23

to his expertise in ballistics, although these are the areas of testimony he now complains of on appeal.  Thus, although defendant complains on appeal that his examination on the issue of qualifications was foreclosed, and that the witness testified to matters outside his expertise, these matters were not properly preserved for our review and we will not address them. LSA-C.E. art. 103A(1); LSA-C.Cr.P. art 841; <u>State v. Thomas</u>, 427 So.2d 428, 432-433 (on rehearing) (La. 1983).

<u>State v. Lesley</u>, No. 2003-KA-2498, pp. 13-14.

A review of the trial transcript reflects that defense counsel did lodge a general objection to Dr. DiFatta's qualification to testify as an expert in the field of forensic pathology. Specifically, in response to the trial judge's declaration that "I will qualify him [Dr. DiFatta] as an expert in the field of forensic pathology . . .", defense counsel stated: "Respectfully note our objection."  (State rec., vol. 2 of 4, p. 246).

Defense counsel, however, raised no specific objection to Dr. DiFatta's opinion testimony regarding the position of the victim, Tina Lesley, at the time she was shot.  Nor did counsel object to Dr. DiFatta's testimony regarding the location from which the shot was fired.

Q.  How was Tina Lesley killed?

A.  Tina Lesley sustained a gun shot wound of the right side of the head and that is her cause of death.

Q.  Can you show the Judge where initially, where you

24

ultimately found the shell fragments or bullet fragments or whatever you might consider these leftovers?  You can use my head if you care to.

A.  Okay.  The left side of the head, if you can turn this way (Indicating).  The entrance wound on Mrs. Lesley was on the right side of the head right on the inside of the right ear at this point here (Indicating).  Also, around the ear was what we called an abraded or a scraped area as well as bruising both beneath the ear as well as on the skin underneath that area as well.  This is from a concussive effect from the energy of the bullet itself upon entering the ear at that point.  There was no evidence of stippling or gun shot wound residue around the entrance wound.  And by stippling I mean when a bullet is fired also [what] comes out with a bullet are smoke, gases, as well as unburned gunpowder flakes.  If close enough, those unburned gunpowder flakes can impregnate on the skin and cause . . . small pinpoint red areas.  This is stippling.  Also, you can have some deposition of the hot gas or the soot around the entrance wound if it's close enough.  That helps me gauge [the] range of fire in some cases.  In her particular case, there was no evidence of stippling.  There was no evidence of soot deposition around the entrance wound. Based on that, it is my opinion that it is a distant gun shot wound.  Now, if I had had some stippling or some soot, you can demonstrate it by test firing the weapon. In this particular case, the weapon was test fired to find out exactly what distance would we not see stippling or gun shot residue.  The bullet traveled through the right side of the head, fragmented into many, many pieces as evidenced by x-ray photos.  Overall direction of this injury is right to left.  Also recovered around the ear as well as also within the brain matter itself were multiple fragments as well as black pieces of the sabot which encloses the bullet itself.  So the sabot as well as the projectile fragments were recovered in the head.

Q.  Thank you, Doctor.  If I can return your attention to what I believe will be your report State's Exhibit Number 3.  If you could indicate to the Judge what we are looking at with regard to evidence and injury?

25

* * * *

A.  This is a photo that was taken on the scene on the right side of Mrs. Lesley's head.  The entrance wound was here.  There is caked, dried blood around it, but this is the entrance wound on the right side of the head.  Again, this is just another photo of the right side of the head and dried blood that is running down the ear here.  You can see a little bit better the entrance wound right here. . . .

Q.  Doctor, this is a photo later on showing that Tina Lesley was in repose on a sofa.  Is the blood flow, which is depicted as dry here, is that consistent with the effect of gravity that you would expect if that was the position that she was shot?

A.  Yes.  The amount of blood and the flow of the blood from the wound itself [are] most consistent with her position at the time of death . . . .

* * * *

Q.  Do you know anything about the age of these injuries on Tina Lesley's interior shoulder?

A.  These injuries as bruises go are recent bruises and that's the best I can say.  With regard to a time frame, they are dark purple, which would suggest anywhere from seconds to minutes to hours.  An[d] unfortunately, that's the best we can do at this stage of bruising.

Q.  Could these in fact be consistent with a gripping type injury that took place within a short period before Tina Lesley's death?

A.  That's possible.

26

Q.  Are these injuries, in your opinion, consistent with shotgun or black powder rifle which might have a significant recoil by these being consistent with the type of pattern injury that you might see from a gun stock position[ed] somewhat awkwardly on her arm or high shoulder?

A.  The only way this could be from the stock of a gun is if just the tip of the stock was resting on the body at the time.  In other words, if the whole surface of that stock was resting on the body, I would expect to see a much broader band of bruising compared to a small spot such as that.

Q.  Would you in fact with a typical shooting posture in fact expect to see bruises in a different portion on a fleshier part of Mrs. Lesley's arm and chest area?

A.  Yes.

Q.  In fact, I want you to take particular note of this photograph depicting Tina Lesley in repose on a sofa. What can you tell us about her posture here as well as any blood flow or blood splatter with regard to whether or not you think she was there when she was shot?

A.  There is, based on Mrs. Lesley's position, there is no question in my mind she is in this position at the time she was shot for two reasons.  Number one, it is obviously the recumbent position.  This is not a position someone would just fall into by chance if there had been a struggle.  Certainly not a position someone could be in if they were shot during a struggle.  And the simple fact that number two she is obviously in a reclining position, but also because and we will see in other photographs, she has brain and blood matter as well as bone fragments on the arm of the couch . . . directly beneath her head. If her head was raised at any time while she was shot, if she was sitting up while she was shot, we would expect to see brain fragments, blood splatter, something on the wall, arm on this couch, up here, on the wall behind her

at that point.  No, this is very - - this is a .50
caliber weapon.  This is going to cause some type of
splatter based on what we have on the left side of that
head.  (Indicating).

Also, if you look at the pattern of blood flow, it
is perfectly straight down just with regard to gravity.
If she had been up at some point, I would have expected
to see blood flow around here or on the floor or on the
back of the couch, something to indicate her position was
in a more upright posture.  As it is, because of the
directed down flow at this point here, there is no
question that she was in that position.  (Indicating).

* * * *

Q.  Doctor, let's take a look at this position.  With
what you know about the characteristics of the wound on
the exterior, and the course and track of the bullet,
would you find that this position would be consistent
with where the shooter might be at the time of pulling
the trigger?

A.  With regard to [the] position of the body as well as
the body on the couch and the couch itself, because we
have an overall right to left projectory, the muzzle of
the gun itself would have to be either at the foot of the
couch with a little bit of movement right or left.

State rec., vol. 2 of 4, pp. 249-255.

Based upon the fact that counsel did lodge a general objection

to Dr. DiFatta's qualifications to offer expert opinion testimony,

along with the fact that the instant issue was addressed on the

merits in connection with Lesley's post-conviction application,

this Court declines to find the instant claim to be procedurally

barred.  However, for the following reasons, the court finds said

claim to be without merit.

First, as the district court observed in rejecting the instant claim on the merits and as the above-quoted testimony reflects, "Dr. DiFatta did not testify to markings on bullets or anything else which is properly part of the field of ballistics."  Instead, Dr. DiFatta "spoke to the path of the bullet entering the victim, its effect on her, and how her body reacted.  All this flowed from the physical evidence provided by the victim's body.  A forensic pathologist's expertise extends to that which can be shown from such physical evidence."  State v. Lesley, No. 344576 "I", p. 2 (22nd JDC Aug. 22, 2008).

Second, it is well-established that federal courts possess only limited authority to consider state evidentiary determinations in a state prisoner's habeas proceeding.  Burgett v. Texas, 389 U.S. 109, 113-14 (1967).  As long as the evidentiary ruling, in this case, the trial court's determination that Dr. DiFatta be designated as an expert in forensic pathology and be allowed to offer opinion testimony regarding the position of the victim at the time she was shot and the approximate distance from which the shot was fired, is in accordance with state law and infringes no right protected under the Constitution, habeas relief is not warranted. Id.  See also Robinson v. Whitley, 2 F.3d 562, 566 (5th Cir. 1993),

cert. denied, 510 U.S. 1167, 114 S.Ct. 1197, 127 L.Ed.2d 546 (1994).   In this case, the court finds that no such right was infringed and, as such, petitioner's claim for habeas relief is without merit.

**Sequestration Violation by Victim's Sister**

Louisiana law expressly exempts from a sequestration order the victims and their family members. La. Code Evid. art. 615(B)(4); State v. Johnson, 833 So.2d 508, 511 (La. App. 4th Cir. 2002).   In accordance with this law, the trial court exempted from his sequestration order members of the victim's family, including the victim's sister, Alicia Hendrix.

During the trial, it came to the court's attention that Alicia Hendrix had violated his sequestration order.   Hendrix admitted under oath that she had advised her husband, Stephen Hendrix, not to change his story and that she had left the courtroom because a gun was being held up for display.   As a result of Hendrix's violation, the trial court excluded Hendrix from the courtroom with a warning and a threat of jail should she continue her activities.

Lesley claims that the above action on the part of the trial court was insufficient.   According to Lesley, he was unduly prejudiced by Hendrix's violation of the trial court's

30

sequestration order and, as such, is entitled to habeas corpus relief.

In rejecting the instant claim in connection with Lesley's post-conviction application, the district court found that "Hendrix's comments and actions, while improper and in technical violation of the sequestration order, were not so strong as to prejudice Petitioner's trial as there was no indication to suggest her comments influenced any subsequent witness's testimony." This Court agrees.

The matter at issue was a minor one which in no way touched on Lesley's guilt or innocence.  There is simply no reasonable probability that the verdict in this case might have been different if Hendrix had not violated the trial court's sequestration order. Accordingly, said violation does not warrant the granting of federal habeas corpus relief.

### Ineffective Assistance of Counsel

Petitioner argues that counsel was ineffective due to his failure to object to DiFatta's testimony that was outside the realm of his expertise, failure to obtain witnesses to offer testimony regarding his intoxication on the night of the murder, and failure to call as a witness the mental health physician who had treated the victim.

In addressing the above claims in connection with Lesley's post-conviction application, the state district court first examined the applicable standard of review.

> Petitioner's right to the assistance of counsel is guaranteed by both the federal and state constitutions. In <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court elaborated that the benchmark for judging any claim of ineffectiveness of assistance of counsel must be whether counsel's conduct was so deficient as to undermine the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.  In more direct terms, to prove ineffective assistance of counsel it must be shown (1) that counsel's performance was so poor as to effectively deny the defendant his Sixth Amendment right to counsel and (2) that counsel's deficient performance actually prejudiced the defense so seriously that it is reasonably probable that the outcome of the trial would have been different.  <u>State v. Moody</u>, 779 So.2d 4 (La. App. 1 Cir. 12/22/00). In considering allegations of ineffectiveness, defense attorneys are entitled to a strong presumption that their conduct fell within the broad range of reasonable professional assistance. (<u>See</u> <u>United States v. Cronic</u>, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); <u>State v. Brooks</u>, 505 So.2d 714 (La.), <u>cert. denied</u>, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987).)

<u>State v. Lesley</u>, No. 344576 "I", pp. 3-4 (22nd JDC Aug. 22, 2008).

With regard to Lesley's claim that counsel was ineffective because he did not object when Dr. DiFatta offered testimony outside the scope of his expertise, the district court concluded that Lesley had failed to show any deficiency on the part of counsel because, as the court had noted earlier in its opinion, Dr.

32

DiFatta did not offer testimony outside the scope of his expertise. Dr. DiFatta's testimony regarding where the victim had been when she was shot and where the shot was fired from was based upon his examination of the body and exit wound.  It was not outside his expertise.

This Court, based upon its examination of Dr. DiFatta's testimony, finds that the district court's determination in this regard does not represent an unreasonable application of <u>Strickland</u> to the pertinent facts.

Next, Lesley complains that counsel was ineffective due to his failure to call witnesses who would have testified regarding his intoxication on the night of the murder.  Lesley also complains that counsel was ineffective due to his failure to call as a witness the mental health physician who had treated the victim.

"[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative." <u>Evans v. Cockrell</u>, 285 F.3d 370, 377 (5th Cir. 2002), <u>citing</u> <u>Sayre v. Anderson</u>, 238 F.3d 631, 635-36 (5th Cir. 2001).  To show the prejudice required to support an ineffective assistance of counsel claim premised on the failure to call a witness, a petitioner "'must show not only that [the] testimony would have been favorable, but also that the

33

witness would have testified at trial.'" <u>Evans</u>, 285 F.3d at 377,

<u>quoting</u> <u>Alexander v. McCotter</u>, 775 F.2d 595, 602 (5th Cir. 1985).

With regard to counsel's alleged failure to call witnesses who would have provided evidence to the effect that Lesley was intoxicated at the time of the murder, as the state district court noted, "[e]xpert evidence was produced by the defense at trial about Petitioner's intoxication . . . ." <u>State v. Lesley</u>, No. 344576 "I", p. 4 (22nd JDC Aug. 22, 2008).  As this Court noted, defense counsel called substance abuse expert Patrick Kent who opined that Lesley's alcohol level at the time of the murder was 0.15, approximately one and a half times the legal limit for driving.  Further, lay witnesses who saw Lesley shortly after the murder provided testimony to the effect that Lesley smelled of alcohol and/or seemed to be drunk.[13]

Based upon the above, the Court finds that the district court's denial of Lesley's ineffectiveness claim was not an unreasonable application of <u>Strickland</u> to the facts of this case.

As to Lesley's claim that counsel was ineffective because he failed to call as a witness the mental health physician who treated the victim, as the district court noted, defense counsel "subpoenaed the nurse who was the custodian of the psychiatric

---

[13]<u>See</u> discussion <u>supra</u> at pp. 20-21.

records of the victim . . . ." <u>State v. Lesley</u>, No. 344576 "I", p. 5 (22nd JDC Aug. 22, 2008).   The records from Psychiatric Northshore, the clinic where the victim was seen, were introduced into evidence and defense counsel, during his closing argument, made reference to the records and the fact that they reflected that the victim suffered from depression.  (State rec., vol. 3 of 4, pp. 571-572).  The fact that counsel chose to introduce evidence of the victim's depression via her psychiatric records rather than via testimony from her treating physician, as the district court determined, "is a trial strategy decision, and Petitioner has not shown his trial counsel to have performed deficiently."  <u>Id</u>.

This Court finds that the above determination on the part of the district court does not represent an unreasonable application of <u>Strickland</u> to the facts of this case.

Accordingly;

**<u>RECOMMENDATION</u>**

It is hereby **RECOMMENDED** that the instant application for federal habeas corpus relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of

plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. §636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996)(<u>en banc</u>).[14]

New Orleans, Louisiana, this <u>27th</u> day of <u>      January      </u>, 2011.

_____
ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

---

[14]<u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to fourteen days.